We are here at our Central Memorial Council for the University of California in Venice, former Chancellor Robert Birgeneau, and others, Trustee Paul Strasburg, Trustee Perry, Council, and the consolidated appeal for Samantha Luddick with the Columbia Community Sheriff's Office. We will be dividing our time and would like to reserve some time for rebuttal as well. This case comes to this court as an issue of qualified immunity for, in my case, five University of California administrators and three peace officers against claims of excessive force by 22 individual plaintiffs. Your honors are familiar with the Qualified Immunity Analysis. It is two prongs. The first prong asks whether the conduct of the defendants violated a constitutional right of the plaintiffs. And then the second prong requires the plaintiff to demonstrate that that right was fairly established at the time of the incident in question. So, taking the first prong, the conduct of the defendant and the unresolved constitutional right of the plaintiffs, there are two types of conduct involved in the defendants here. The two officers, Flackler and Andrew Tucker, Sergeant Andrew Tucker of the UC Police Department, actually engaged in physical confrontation with two of the plaintiffs, the protesters, and actually used force. And on the other hand, sir, we're talking about in the senior folks, right? We don't limit our analysis just to those two. I guess those are two key types. Yes. The point I was making is there's two types of conduct in the first prong of the analysis. One is the use of force. And the other is the claim that the administrator defendants and the supervising peace officers failed to act. And so the type of conduct at issue there is the failure to act. So just to put a pin in that in terms of the types of conduct at issue, let's talk about the constitutional right alleged by the plaintiffs. It's this case here on excessive force, but the case was brought on a First Amendment basis on claiming a First Amendment right to erect an Occupy-style tent encampment on Sproul Plaza in the middle of the University of California at Berkeley. And over 35 years ago, the U.S. Supreme Court faced this very issue. Why are you talking about the First Amendment? Do you want to comment on that? Yes, and the right asserted by the defendants is the right to prevent the police from removing a tent encampment that was erected illegally. That's the right that's asserted. And I raise the right that the plaintiffs are complaining that it was violators getting basically threatened not to keep people at the times for doing what they should do every single day. So, yeah, we'll take into account that the logic of the officers actually removed those tents. Yes, and this has nothing to do now with the First Amendment, so I'm not sure why you're veering off into that. Let me ask you to focus on that for one moment, Judge Monford. And the case decided in the U.S. Supreme Court over 35 years ago, a community organizing group called Community for Creative Nonviolence wanted to set up tents to protest homelessness. They made a request for a permit to the Park Department and said we want a tent. So it's the first ever right to set up tents, and the U.S. Supreme Court said you can't do that. Anti-camping regulations are valid, time, place, and manner regulations. That principle was established over 35 years ago. Here, what this group did, called by any means necessary to their complaint, that's the name of their group, it affects the ages or not. You get to the age bar, which is controversial as you can. So rather than do what the Constitution allows, petition the government for redress of grievances, there's always a dispute over whether tents can be set up through the courts, through the governmental process. What this group did was impose mob rule, and they said we are going to prevent the police. We want to set up this tent encampment. We're going to prevent the police from taking it down by using force. We're going to link arms. We're going to prevent the police from taking down this tent encampment, which is well established, is illegal mining. So removing the tents was legitimate. Let's say that we agree with you on that. All right, go forward now. So let's see. Right of left in the complaint is a force amendment, right? The force amendment prohibits unreasonable searches and seizures. And the police here, in trying to remove the tents, were not trying to search or seize these places. They were trying to get them to move, to go away. And instead of going away, they remained. And so the police resorted to the use of force, hands and batons to move the plaintiffs out of the way so they can carry out their lawful duty of removing this illegal tent encampment. And the right asserted by the petitioners, the plaintiffs, is the right to prevent the police from doing that without getting pushed, without having a baton used on them. Obviously, the police did what you told me, and this is their experience, and it's your experience. Let's say the police just went in and just started cracking heads with over-instructions and batons to get the people out of the way. You're not going to stand there and say, we're not going to move them, right? So they're saying that the level of force used to get them out of the way was excessive. And you, right now, are taking minutes of your time to get into that. So why are you addressing that issue? Then what is the evidence on the level of force used to get them out of the way? Well, there's two types of conduct. Only two of the appellants here actually used any force at all. That's not the administrators. That's why I started writing this in. There are plenty, there are plenty of affidavits from the plaintiffs in which they say that officers used overuse of force, and in some cases, they had to carry it. And that doesn't matter because it's associated with the administrators, right? They authorized the officers to go and use force to tip those tents in. So that's what you need to address, is to tip these tents in. So how are we going to conduct the officers in case they do? And what the record shows on that point, on the use of force, is that California has adopted a commission on police officers standards and trainings that deal with the use of force by police. It has standards that we constitute for us. It has the whole purpose of having this commission. The evidence is not rebutted on the record that the use of force by the police was in compliance with the post standards. No. No, because some of the plaintiffs say that they were hit in the head and that Gary Woods would talk to them. It's not permitted under the post standards. The, there was no affidavit or any testimony in the record from, on the plaintiff's side, to rebut the expert testimony submitted by the defendants on compliance with the post standard. So it's expert testimony unrebutted. There was, as you say, a plaintiff submitted an affidavit, I would say that they had in the next month, Certainly, but no description of the consequence or the level of force used in those strikes. It's not permitted. The strike zone in the head with the baton, that is the level of force. So there are affidavits and maybe a trial. You all would be able to convince the jury that the attack, it was just an attack on the head, it was not a strike. But that's the question right now, right? Is there any other state of the evidence with respect to the use of force, is that there is no medical record of any injury by any plaintiffs? There is no. I have a question. The concern is raised in a law position by the administrators that the police have used force to remove two for two. Which means they can't do the right thing. Not quite correct, Your Honor. What we're getting at is the authorization, as you say, and the direction that we're given by the administrators of the police, does that mean that the administrators are not accountable for what it could have looked like if the police carried out? Well, that's the allegation, and that's the alleged misconduct of the administrator defendants was a failure to act within the evidence that the administrator defendants called on the police to enforce the no camping regulation for very good reasons. This is a university campus. Go ahead, Your Honor. Go to the bottom. Okay. Go to the bottom. Well, Section 1983 requires a personal culpability. The cases of supervisory liability deal with situations where you have the supervisor observing the prison inmate being beaten or mistreated and failing to exercise the supervisory authority to stop it. In this case, you've got the university chancellor and history professor and the communications officer, Claire Holmes, who have no responsibility for supervising the police. And the allegation is they have a constitutional duty to somehow tell the police, exactly how much force to use. Now, there are times in the humanities case, those are the allegations from the plaintiffs, is that the administrator folks basically said, under no circumstances, no circumstances whatsoever are you to allow this case to remain past time. Right. And that seems to carry by those interactions with the police. If I were an officer and I got that command, I would assume that means if I ever need resistance, I'm going to have to overcome it by some kind of way, right? Yes. So there was no, to me, the interaction that the administrators gave, there was no calibration for, well, if you meet this level of resistance, then you're going to need to start using overhead suites, the batons on students. Maybe we should back off at that point. There was just a charge to the police to do whatever is necessary to overcome whatever resistance you meet. So now we're in another area. Not do whatever is necessary, because then the administration specifically said, I don't want to see tear gas, I don't want to see pepper spray. That's not how it works, because then you're only limiting the police to basically the batons and guns. Right. That's all they have. And so now you have to reduce these bars to that point. Whatever level of resistance you meet, you must overcome it. Now, okay, so what? Tell me what I'm missing. Well, what you're missing is California has these post-standards. The police are trained in the use of force, and there are appropriate levels of force used to overcome resistance. And in this case, this started out with verbal commands, an announcement to the crowd in general, by Officer Tejada over at the boulevard. And once the crowd failed to respond, a skirmish line moved in saying, move, move, move. And the evidence is undisputed that the plaintiffs here heard that and refused to move because they wanted to defend the kids. And so the constitutional principles that the plaintiffs seem to be advocating for is that they have a right to erect tents in violation of law and maintain them there in perpetuity. It's just because some level of force is required to overcome their resistance. But let's say it's an extreme level of force that's going to be necessary given the circumstances where we're vastly outnumbered by the drones. That's all we have are batons. We can't use nuclear gas. We can't use number spray. What we need is to start cracking some heads, because that's the only thing that's going to allow us to get to the test. And that's all I'm saying is how are the officers on the corner supposed to interpret the direction under those circumstances for those tests to be allowed to continue? It removes a test consistent with the use of force standards applied by the zone. You can see there in this one. So we go there, we start jabbing people, we're sent over, there's tons of them that don't move. You can't just go back to the station, right, because we would have failed in our attempt. So I guess, as the follow-through grew, and I say, we need to escalate this because these people aren't responding to the moderate use of force, right? I've been told I can't come back here without having to remove those tests. So what am I supposed to do? Overcome the resistance of the lawbreaker who is preventing the police from exercising their, carrying out their constitutional legal duty to maintain this campus for the benefit of all students, all faculty, the public, the guards. There's nothing wrong with that. There's nothing unconstitutional about asking the police to enforce the law. And the alternative is mob rule, that they can erect this tent and defend it from the university and Purposeful Black People's Park. It's been there for 40 years. They had this tree stood for 19 months, and the administration made a reasonable decision that this law should be enforced in this circumstance, and they asked the police to do so. And the police did so. They removed the tents. They were required to use some level of force to do so because of the illegal conduct of the protesters. And the evidence is that the force used didn't cause anyone any injury that required medical attention and was consistent with the standards of the California police officers. To be a smooth question, I would agree. So I was focusing upon what the police officers did with pointing, using hands, pointing the tongue. I understand that argument. That reads very well. And if their limbs or arms were used to obey proper orders, that didn't seem to be much of an escalation. I think the problem is there's some hesitancy or piety of an affidavit or declaration that head strikes were used, and that becomes something different. This is not a hard case. If all you're doing is using hands and pointing the tongue, what's head strikes for? So tell me how you just get through there the administrators or even the police to use head strikes. Well, first of all, the administrator is no administrator authorized or was aware of the head strikes by anyone. This is something that was inserted into affidavits after the fact, during the course of the civil litigation. I have divided my time with Mr. Perry. Yes, answer my question. So the answer to your question is, if there were actual evidence that a head strike could violate civil code standards, that would be excessive force under the circumstances of the hands. There's not that evidence in this record. Why? Did you just tell us there's a declaration in the record? Yes, for two plaintiffs, Anderson and Uribe. And it was only Uribe that made reference to being on sentence. I was struck in the head in that video. Okay. Okay. Yes. So that may have been an issue of fact as to the use of force by the individual plaintiffs, and that's certainly Mr. Perry's issue. I'm not sure if we're talking about Uribe. Yes, and Tucker as well. The reason I'm saying this is because I've used up my six minutes on irrelevant stuff. We have not discussed the administrator defense, Your Honor. It's a very novel concept that university administrators have the duty to micromanage the police when all they can. He wants to rely on the QA. That's a good question. That's fine. We'll give you a couple rounds. That's fine. I think let's just definitely put there a few minutes. Good morning. My name is Russell Perry for Officer of Legislature. I'm going to be really fast. I understand a lot of time has been used, so I'm going to try to zero right in. Do you remember the question I just asked regarding the DC administrators? No. Have you seen anything? I said I understand everything about using hands and using it. That's not a question in my mind. The question in my mind is there's a declaration of a head strike, and that declaration is not tied to Officer Klapsler. There's been no accusation of any strikes outside of the zone that was in the policy for her, for all her strikes, for her strikes within the force of law. That's part of the policy. For how many minutes do we have to do this to keep all officers? I understood you. I asked what we do when Mr. David says someone got a head strike. We're going to identify that officer. They did not identify Officer Klapsler at the opportunity when we solved. So if the district court says, yes, there's something here, we have to go to trial to make that identification. Well, then the opportunity for that was during the discovery phase, and to identify Officer Klapsler was made at the district, but there's been no accusation. The discovery phase after Officer Klapsler. I understand you, Representative. I'm asking a different question. What do we do with a declaration that says there was a head strike? Well, if it's a chief of act, you know, if you guys still have one, you can say, well, there's a guy shooting. I apologize. Yeah. The issue for us, I'm sure it's a qualified meeting, but I assume we're also looking at cases. Even if there's a violent constitutes a violation, we have to look through the cases to show that it was clearly established at that time, and we have to look at the facts of the case. And I think I was talking about the second call. Yes, there was, you know, the court, the U.S. Supreme Court, and by the new policy, you need to identify a case where an officer acting under similar circumstances violated the Fourth Amendment. The cases relied upon by the district court are not similar to the facts of this case at all. The cases that you've cited were the KB versus Koch, which involved what's known to these cases, involved a principal that had smacked some kids, who put their hands in a locker, and he was actually charged with battery. Totally different facts from what we're dealing with today. The district court also cited the Schwartz case, which we're all familiar with, but that often didn't involve mass crowd control. It involved six to seven load testers, and it was a pepper spray, not the batons. And there was other means that was not applied force. There was a grinder, and there was clay, and it was in for the pepper spray. So there were other issues. It's not actually similar to our case. And finally, the other case, the district court also cited one else, who was found versus the county of Los Angeles, and that one involved a saboteur, and the driver came out of the car and were heading to disobey orders to get back into the car, and he conferred a seat on the curb, and the officer that had been playing pepper spray on top of him and then used the baton strikes eight times with the head. And that case is totally different from what officers like this are dealing with. You can comment on this. I'm not sure if it's a deep question. I'm not even familiar with it. I might switch. All right. There's some lawyership from yourselves. You tell me. In this case, there is some evidence, whether it was a lie or not, that there is some evidence in a declaration that those heads strike. So why do we do that? I don't know. I don't know. I don't want to speak on behalf of this case. I don't represent it. I would defer to Mr. Gray's deferring the process on this one. It seems to me that someone should have an answer. I have an answer that I have. So I want to get your point of view. Okay. Thank you. Go ahead. Do you have anything else? I'll let you reply. I just wanted to point out that these situations are very dangerous times for officers when they're facing mass crowds. It's a very difficult time. And the situation that our officers had, that my officer had to deal with was people were getting hurt, people were pushing back. And it seems not close. And it's dangerous for officers because if those batons can be handed over, they can be used against them. If their firearms can be taken away from them, if they've seen an active resistance crowd. So there's an urgency. Once you are face-to-face there, and if the two strikes aren't working in the crowd, and there's still, there's still getting them, it doesn't escalate when there's pushback. And it turns into a very different situation once they're face-to-face. And there's no, no, no, no,  no, no, no, no. Okay. Good morning. Please support. My name is Sean's driver. I'm the lawyer representing the 21 plaintiffs who are UC Berkeley students, staff, alumni, and in the case of one exception, a university of Michigan alumni, UC Berkeley alumni. Excuse me. Uh, this, we're working on this. It has to be, I'm working on this. It has to do with your declaration by one of the individuals who said that they had a head strike. Are you representing that person? I am. Thank you. What does the declaration say? There are several declarations. The one person that talked about the head strike. There's only one person that talks about a head strike. There is, there, there are at least three people who talk about receiving a head strike in the case of officer Lackler. She goes through in her deposition to a very clear and great extent what the policy of UCPD was at the university of California police department was in the gifts of force in situations like this, and she says included in that policy is a command to, for officers to avoid the areas of the heart, the groin, and the kidney. I understand that. What does the declaration say? The person was struck. What does it say? In the case of officer Lackler, in the groin areas. No, I'm going back to your client. What if your client alleged in this declaration or affidavit about a head strike? One client says that he was hit in the face with a baton. Another client says that he was hit with an overhead swing to the head. And is, do they identify who the police officers are?  And what are their names that they identify? Some of them are not defendants of this appeal. I'm going to share some of this, but there's one, one of your clients says that this is Sergeant Tucker. That's the only one I remember of the defendant's story. So I don't think anyone ever says that to me. I'm sorry. Black, black, black, black. Nobody says that. Officer Tashler did it for me. Right. So there's, no, did you say the 3rd groin? However, I heard that that is. Yeah, I mean, your clients are kind of at cross purposes there. It's the person who supposedly was hit in the groin has asked that. He says, I have no recollection of that. Somebody else has heard from you. We're just, I don't think we know what the person is actually. Everybody says, I can't remember that. So I don't need your help there. But it's confirmed for me that you don't have any evidence in the record that Officer Tashler struck anyone in the head with regards to the deer. We do not. I think whether, I think the question though, in terms of whether her use of force was excessive, excessive or not is a jury question. That's up to a jury to decide. If, if the jury thinks that under those circumstances, the behavior of the police officer constituted excessive force because the police officer and all of the police officers did not appeal to themselves of trying to use other means to clear the crowd, that there wasn't a clear dispersal order, that there weren't exit, there weren't ways for people to exit safely who wanted to exit them. Yeah. And I think that that's a question for a jury to decide. How, how is the jury to decide that? The determination isn't whether or not the, that these acts of determination have a problem too, is that it was unconstitutional at that time. So they were not warned. Your cases don't show that. I don't think, I think, I think the officers were aware that there being, tell me the name of the case that's most important to you. So that at the time it happened, was your case demonstrated that they were violating the rights, constitutional rights of your clients? I think the most important cases, is it Waters Forest? Is it Waters Forest? Yes. I think that there, I think for the, for the police to be able to make a claim that, that they're unaware that their behavior might result in, in constitutional violations that include excessive force, and that they should be conscious and aware not to do it, is, I just can't imagine how they can claim that. It's, it's, it's their own policemen, it's their own operational plan for the day. There's no case that says, that says, that doesn't say that you have to show a case by the court, that it was a violation of the constitution. And I'm telling the participator whether we think they should have been doing better. That's not the issue. Judge, it is true that they are supposed to show a case, but it is also true that the court has filed this report repeatedly, that the facts don't have to be identical, that there might be novel cases in which questions of liability are, are being considered. I think the other cases that, that we, that we cite, I probably have six here. Thank you. Okay. Great. Can I ask you about these particular defendants? So help us with the analysis. They're looking at it from their standpoint. They say, it's fine. Yes, we made it clear. We want to just remove, but we assent to Greg, so that the officers would use force within the guidelines that we're signing. So we certainly don't think you start grabbing some heads with your batons. If you need resistance with everything that we said, you have to deal with the guidelines that are provided. And that did not exclude. So if anyone went outside of that, concerning people being handled over your streets, you can also, the administrator said, let's just say, we never authorized that. We had no idea that they were here to do that. So how can we be unlawful? The administrators of this case constituted an emergency management team, whose job it was to make sure that there was civilian supervision and police supervision of the police tactics used on that day. That whole team decided to leave campus at 7 p.m. knowing full well that there had been a fire arrest earlier in the day. And that one person had been hospitalized earlier in the day due to the police tactics. So are you conceding that there's no liability on their part for what happened in the evening? Because we could not have predicted that overnight. No, I'm not conceding that because of opinion. I'm starting with that. So start with 3 o'clock, 3, 3, 4, 3. So why are they liable for what happens in the evening? Because they speak to the police that the police must do whatever is necessary to take down those tents immediately. And in doing so, they're commanding the police to use any means necessary to take down those tents. They state, Chancellor states that the police are not allowed to use pepper spray or tear gas in order to achieve that. And so there's definitely specific management of the police tactics that this administrative body is taking. The administrators make a point of saying that they were absent at the moment that the police action took place. They were conveniently only on site and only witnessed things in what they considered to be the so-called peaceful part of the protest. After the students took a vote to put up tents, there was no administrator to be found. Their job was to be there. Their job was to prevent what happened that afternoon and what would happen that day. But so you're saying it was the administrators' jobs to actively manage the police? Yes, that was their job. And they knew that from two sources. Okay, first of all, that's in their fundamental policies and part of their occupation, part of their plan for that day. But also, they had been through a long review process of a similar event that had occurred in 2009. And there was a commission that issued a report, and in that report it said, among other things, in order to avoid the potential of excessive force and liability, in order to make sure that the grand justice being applied, it is essential that administrators, not just the police, are making the tactical decisions and reviewing them as they're happening about what is going to be taking place. They were, they had fair notice of what it was that they were supposed to be doing, and they absolutely just neglected their duty to carry out the responsibilities that they had assumed when they became the crisis management team. No, was that their title, crisis management team? Yeah, crisis management team. Close, yes, one of their titles. The name changes a little bit, but it's crisis management team is what it's called. So, all of these defied the administration, what they said here. So, what if the administrator was part of the company, and his responsibilities did not apply in Iraq?  okay, he asserted his authority in the situation through a series of emails that he used to communicate with the crisis management team in terms of what he thought needed to be done. I have a simple question. The simple question was, yes, you know, I have to go to a clinic in Iraq. So, my home at 430 and 7, they stayed in contact because I understood through their email of what's going on. They did not send you an email? No, I'm sorry, it was in the briefs. I didn't search directly on that issue. Someone was misbehaving. Your view is that they cannot delegate to the police that you are to act this way. The police have their own way, their own personal settlement. And so, because somebody says, and by the way, don't use pepper spray, they therefore are indicating that they are going to be responsible for anything the officers do. Is that your point? They are responsible for the guests. They are responsible for the actions of the police. Their job was to determine what level of force would be used, what level of negotiations would be employed, what a median might be. The chancellor has said, what do I get then? I'm sorry, the median may be a record. It is a record. And it came from what? It came from their own discussions about what their operational plan would be. And it came with their agreement to follow the recommendations of what is called the Brazil report, which was the report that looked at the prior event on campus, in which there was outrage by the campus on the use of force by the police. So, they have undertaken a specific responsibility, which they abandoned. And every single, I'll give you an example, the testimony of the administrators in this case defies any kind of notion of, unless they are completely incompetent, it defies any notion of credibility. One of the members of the CFPT was a woman in their homes who was responsible for all of the media communications that the university would have with the outside world. She has her staff assigned that day to look at all of the video footage, to read out tweets, to look at the news coverage. She knows when she leaves campus that there are news helicopters overhead. Her claim is that she did not see the videos or knew what the police did directly from her own observation until 10 p.m. at night, when she returns from an Eagle Scout meeting and turns on the TV. And then she's appalled to see what it is the police did. Now, I don't think anyone can believe that testimony. You never know what you're reasoning to do. It's up to you, Joey. Don't try to try to tell me. Tell me, what cases have you cited that's a violation of a constitutional right that she would be aware of on the day that the occurrence? She's a penitent in Waters, Indiana. Well, that is Forrester v. San Diego. It's Gravelin v. Shelton. Are you reading from a list? Can you tell me what those cases are? Yeah. They hold that, on Starbreeze, that there's a debate about whether or not the actions of the protesters was constitutive, active, or passive resistance. And Forrester describes an incident in which a police officer approaches a driver. He's being pulled over, asks him to get out of the car, please, and places his hands on his head and walks towards the officer. And the person in the car fails to do so. He starts screaming. He starts tapping his legs. He stays in the car. He eventually gets a teaser, and the court found that that was excessive force. And in Forrester, it's a case in which there are a group of Operation Rescue members who are sitting in front of a nursing clinic, and they don't live there. And they're refusing to vacate the space that they're in. They're being nonviolent in their actions. But the court looks at the balance between the rights of the individuals to stay there and the right of police and the state interest involved in moving those demonstrators so that it's possible for women to get into that clinic, for doctors to provide medical services, for the clinic directors to be able to carry out their activities. And the court finds that, yes, under those circumstances, it was correct for the police to go in and to remove those demonstrators because there was the imbalancing between the state interest and the interest of the individual. The court concluded that the state interest justified what the police did. So I don't know if you want me to continue. That's fine. Thank you. I would just say that there's a reason why the counsel for the administrators cannot defend and so does not try to defend their actions in this case and attempts to obfuscate the issue or to place burden on the individual police officers and what their conduct might have been. And in this case, it's like the administrators are these, you know, skate racers going down a slope. And they're on a slow-up course. And they've been instructed that if they stay within the gates, that they can't be held liable for what occurs on that, for their own performance on that team. So they want to make sure that they are not present when some of the brutality takes place so they can say, A, we didn't see it, and B, we couldn't stop it because we weren't there. And it's just so dishonest. So help me with this. If you're able to point to specific things from the record, let's assume that the administrators were entitled to believe that the officers would not use ordinary constitutions as a force, that they would use the laws in an appropriate way. At what point could the administrators in your view become aware that, you know, existing rules and laws was being engaged in? Specific knowledge that they were told or saw videos? Anybody have in the record that speaks specifically to that? No. I think the only evidence in the record that speaks specifically to that is the creation of a hub, which is the center where all of the administrators are supposed to be, which is getting continuous live feeds from what is taking place on the campus. And all of the administrators say that they didn't see something while it was taking place, including in the afternoon. The first time they became aware was when a student told them or they heard it from somebody else. But they're sitting in this hub. They're getting continuous feeds. I just think it's such a pretentious stance to take that they didn't see what was happening while they created this hub. These are the videos that you gave us on DVD. Are they properly before us? Do they not get excluded? They do not get excluded, George. They are not among the videos that got excluded. Okay. And you're saying that you have evidence that whatever we have on the DVD, that folks will watch them in real time? I can only say this, that what is on those DVDs went viral. By the evening, tens of thousands of people had seen those videos. The only people who hadn't apparently were the administrators in this case. They had the most direct and immediate interest in reviewing those videos. So, no, there isn't evidence that they saw those videos, but they saw something. And if they didn't see anything, then they are, you know, people to be held responsible as supervisors because of their clear incompetence and their unwillingness to be able to take the slightest responsibility for the actions that were going on, which was their responsibility to control. Okay.  Thank you very much for your argument. Let's give three minutes for a vote. Just on the administrator point, the proposition we submit is there is no constitutional duty on the part of the administrators to allow mob rule on campus and to violate the law with respect to the Lieutenant Camera, just because there's a mob there wanting to do that. And as a thought exercise for the panel, imagine that it wasn't Occupy Wall Street. Imagine it was the alt-right. Imagine it was Nazi sympathizers wanting to come and set up a tent. The administration, it's their responsibility to maintain the campus to be useful. With respect to the Officer Tucker, the question that was asked that I stumbled on at the first part, the statement in the record with respect to being hit in the head comes from, thanks to Anderson only, Joshua Anderson. It's ER 1623-1624. And what he describes is the police pushed us further down the grass. The officer in front of me at the time, Officer Timmy, ground the end of his baton into my ribs and shoved us along with other officers. He hit me repeatedly, two to three times, and also pushed me. Reference video 23. Then another very tall officer, Officer Tucker, hit me in the neck and face with his baton three times. That's it. That's not permissible. You can see that that is not allowed. What is? I mean, this level of resistance that the officers face right now. I understand Your Honor's reaction. Am I wrong about that? Well, yes, because there is nothing in the record to describe the context of this encounter, what Anderson was doing with Officer Tucker at the time, the level of resistance that Mr. Anderson was in. You want to take that position. They're saying, my guy was standing there and someone just locked him in the head with a baton, and that's not permitted. So if someone has to resolve that dispute, if there's no disqualified immunity, the current point is excessive force. Excessive force is always a spectrum of what's the level of resistance being mounted by the plaintiff and perpetrator and what level of force is being used. And what is missing from the plaintiff's submission is that part of the advice is the underlying dispute is facts, and it needs to be resolved before we can figure out whether the officer is entitled to qualified immunity, correct? Yes, he is resolving the problem first. If the facts turn out to be that the plaintiff and the person who was standing there not engaged in any kind of violent resistance to the officer, and the officer hid in the head with a baton, the jury could find that that's excessive force, and the officer would not be entitled to qualified immunity for that, right? Under that hypothetical set of facts, which is not in this case, because we don't know, that's my point, that's correct because no one is qualified to use that. So we don't know whether or not the force used is actually excessive for prog on analysis. And on prog 2 analysis, plaintiff's burden and the staffer versus PDU case, which we cited from six weeks ago. The water balloon case. Yes, in UC Santa Barbara, there was a jury finding that the force used actually had been excessive. And the ruling of this court was the officer was nevertheless entitled to qualified immunity because it was a challenging environment, and there was no case law on point directing that this particular use of force against this particular plaintiff was excessive. Okay. I think in getting to the point, which was what I've been trying to find out, it was assumed through the same argument that the jury was going to find that the case officer used prog and hit him in the head. Assume that. That's prog 1. I hate progs. That's step 1. Step 2, which if we knew what we were doing when we wrote these opinions, would be step 1 instead of step 2. Step 2 is, was there a case that would show that there would be a violation of constitutional rights at that time when he actually hit the man? So there has to be a join of such a case, and I think that you disagree that there is such a case. None has been cited in the record. In the district court, the plaintiff didn't even brief qualified immunity, and there's a retracement brief, which is why we included the briefs in the record. And on this appeal, no case has been cited. We cited in our case the unpublished decision of PECS versus the city of Berkeley, where there was a police service line established where people can set a fire in the street, and the police used batons against a protester who was trying to breach the service line. So the nature of the jurisprudence is that the police are authorized to use some level of force to set a fire, but you cannot go up to someone who is disappointed in your institutional situation, because in 2011, it was clearly established that you cannot use a potentially guilty force, which is the one that Tom struck to the head, a potentially vindictive force, right? We agree with that. It depends on the level of force. That's why we have a factual dispute, because they're saying, I got clopped in the head with a baton, and at least that's not what happened, because it just took a little time. And we don't know, but if it was getting clopped in the head with a baton, that is potentially a deadly force, right? And another framework, we put it on DVD, and theoretically, as a police officer, he says, okay, so it was clearly established in 2011 that an officer cannot use a potentially deadly force on someone who is not resisting, right? They have to care for their lives, work in safety, or use a level of force. In fact, Anderson was not engaged in that kind of deeply, clearly explicit behavior. The, is the plaintiff's burden, on certimony judgment, to establish that there is an issue of fact for trial, and to overcome qualified immunity by chipping away at a clearly established precedent. And all that we have here is this one sentence out of this voluminous record, where one plaintiff says, then another very tall officer, officer took me, took or hit me in the neck and face with his baton three times. He doesn't say, he cracked me in the head. We know he didn't require medical attention. The question is, is, that you, it's important, the question's important is, what case at that time, does that mean? Which so, that you hit me in the head, violates constitutional right, in all circumstances. And it's the burden, of your opposition to show that. What is the case, as far as you're concerned, that is closest to this? I would say it's, it's this court's public decision, in Mags versus the city of Berkeley, as to an officer of Congress, talking about the tragedies of force. Okay, thank you very much. The case we're starting will be submitted on the 3rd of August at 10 o'clock. Thank you. Thank you. Thank you very much. Thank you.
judges: Wallace, Watford, Sands